COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Petty and Huff
Argued at Salem, Virginia


LIBERTY MUTUAL INSURANCE CORPORATION

v.      Record No. 0936-11-3

GARY HERNDON


CAREY ADDISON CONSTRUCTION COMPANY, INC. AND
 NATIONWIDE MUTUAL FIRE INSURANCE COMPANY

                                                OPINION BY
v.      Record No. 0943-11-3            JUDGE ROBERT J. HUMPHREYS
                                                FEBRUARY 7, 2012
GARY HERNDON


SHERRY CLARK HOME IMPROVEMENT

v.      Record No. 0957-11-3

GARY HERNDON


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Brian J. Rife (Midkiff, Muncie & Ross, P.C., on brief), for Liberty
            Mutual Insurance Corporation.

            Thomas H. Miller (Roberta A. Paluck; Frankl Miller & Webb, LLP,
            on brief), for Carey Addison Construction Company, Inc. and
            Nationwide Mutual Fire Insurance Company.

            John C. Johnson (Wade Anderson; Jonas A. Callis; Frith Anderson &
            Peake, P.C., on brief), for Sherry Clark Home Improvement.

            K. Jeff Luethke for Gary Herndon.

            Amicus Curiae: Brian J. Rife (Midkiff, Muncie & Ross, P.C., on
            brief), for Liberty Mutual Insurance Corporation in Record No.
            0943-11-3.

Carey Addison Construction Company, Inc. ("CAC") and Nationwide Mutual Fire Insurance Company ("Nationwide"), Sherry Clark Home Improvement ("SCHI"), and Liberty Mutual Insurance Corporation ("Liberty Mutual") have each appealed the decision of the Workers' Compensation Commission ("commission") to award Gary Herndon ("claimant") benefits stemming from his August 11, 2008 accident.[1] On appeal, CAC and Nationwide, Liberty Mutual, and SCHI assert that the commission erred in finding that claimant suffered a compensable injury by accident arising out of his employment.[2] CAC and Nationwide also contend that no credible evidence exists to support the commission's finding that Herndon was not an employee of SCHI and that, at the time of Herndon's work accident, he was working for David Clark ("David") as a borrowed employee. Additionally, Liberty Mutual asserts that the commission erred by failing to address whether the insurance policy between SCHI and Liberty Mutual was valid as it was based upon false information and did not cover the job actually performed by the claimant and whether the commission had jurisdiction over Liberty Mutual. For the reasons that follow, we hold that there was sufficient evidence to support the commission's factual findings that claimant was acting as a borrowed employee at the time of the accident and that his injury arose out of his employment. We further hold that Liberty Mutual and SCHI are not currently aggrieved by the decision of the commission and, thus, have no standing to appeal. Therefore, we affirm the decision of the commission.

---

[1] The parties moved that all three appeals be consolidated for argument and decision. We granted that motion.

[2] Liberty Mutual, SCHI, and CAC and Nationwide each present three assignments of error on this holding, one for the February 8, 2010 finding by the full commission, one for the September 8, 2010 finding by Deputy Commissioner Burchett, and one for the April 11, 2011 finding by the full commission. However, since this Court only reviews final decisions, we only address the holding of the full commission on April 11, 2011. See Code § 17.1-405 ("Any aggrieved party may appeal to the Court of Appeals from . . . [a]ny *final* decision of the Virginia Workers' Compensation Commission[.]" (emphasis added)).

I.  Background

The relationships between the various parties involved in these appeals are somewhat convoluted as a result of a high degree of informality in the manner in which they did business with each other.  However, "'[o]n appeal, we view the evidence in the light most favorable to the claimant, [as the party] who prevailed before the commission.'"  Basement Waterproofing & Drainage v. Beland, 43 Va. App. 352, 354, 597 S.E.2d 286, 287 (2004) (quoting Allen & Rocks, Inc. v. Briggs, 28 Va. App. 662, 672, 508 S.E.2d 335, 340 (1998)).  In this light, the facts show that David is a carpenter by trade and has a contractor's license.  At one point, he operated his own company, D & C Home Improvements.  Ultimately, D & C Home Improvements became insolvent, but David continued to work as an individual framing houses.

David's wife, Sherry Clark ("Sherry") ran SCHI as a sole proprietorship.  SCHI's business was to clean construction sites.  Sherry does not have a contractor's license.  While David and Sherry often worked on the same construction sites together, sometimes Sherry would work on sites that David never worked on and vice versa.  Although they planned on expanding their businesses into one business, it never occurred.  Sherry maintained an insurance policy with Liberty Mutual for SCHI.

Carey Addison ("Addison") owns CAC, which is a general contractor.  CAC had regularly worked with D & C Home Improvements.  In early 2008, David told Addison that his company was becoming insolvent, but that his son, Jonathan Clark, was starting Jonathan Clark Construction Company and David would remain the supervisor, and all the men that had worked for him would be working for the new company.  Addison agreed to work with Jonathan Clark Construction Company so long as the new company had insurance.

Eventually, Jonathan Clark left to pursue a different career, and Jonathan Clark Construction Company ceased to work with CAC.  David told Addison that his "wife [was]

starting a business and [he would] be the superintendent. [He would] hire the same men and [he would] work for [Addison]." Addison agreed again on the condition that Sherry provide him with proof of insurance, which she did. SCHI performed the same framing work for CAC as D & C Improvements and Jonathan Clark Construction Company had done in the past.

For the job at issue in this case, CAC was paying SCHI to work on a new construction site. Sherry testified that she hired David to frame the job site, because he had the contractor's license. CAC paid SCHI with a check, and then Sherry paid the workers in cash. However, David decided how much to pay his men. Ultimately, David hired most of the men who performed the carpentry for him, and Sherry hired most of the women who helped her clean. In his deposition, David testified that SCHI added his framing crew into her business, so that all he had to do was keep his crew straight, and Sherry would take care of any paperwork. However, he also testified that SCHI hired him and his crew to do the job in this case.

Claimant was hired just prior to this construction job. He needed a job, so he contacted David, his cousin, looking for work. David referred him to Sherry, who "did the hiring." Claimant started working with David's framing crew on August 4, 2008, and on August 11, 2008, sustained serious injuries when he fell through an open hole on the second story of an unfinished building. The building had two floors and a basement. The hole on the second floor was directly above a similar hole on the first floor. Claimant was found gravely injured in the basement, directly under the holes, and suffered severe injuries to his head, spine, and ribs. As a result, claimant spent around 50 days in the hospital and is now a paraplegic.

Claimant testified that he remembers "[v]ery little" about the day of his accident. However, he testified, "I was carrying wood. I remember there was, in the second – the second story, there was a hole off the stairwell as far as carrying the wood up. And that's what – what

they said I fell through, but I don't remember the fall."[3]  He later added that the "only thing I can actually remember is carrying wood up to the guys making the walls."

Claimant also testified that it was part of his job to be near the hole that he ultimately fell through.  When asked to clarify, claimant explained, "Well we—Where we were carrying the wood up, the only way we could get it up there was steps that went up by the hole.  That's the only way I could get the wood into the house."  Based on their location, claimant would have been within two feet of the hole when he was at the top of the existing stairs.

James "Jim" Hall ("Hall") was CAC's superintendent at the time of the accident.  He testified that he saw claimant earlier in the day "up on the floor" helping "pull plywood." "Pulling plywood" is when "[s]omeone is pushing [plywood from the first floor] up and you're pulling it up to the floor to use it to put it on the floor or wherever you're putting it at."  Hall observed claimant doing this "kind of early in the morning actually," but he does not know exactly when.

Ben Clark ("Ben"), James Musick ("Musick"), Dale Clark, Mark Anthony Webb, and Carless Trigg Clark were all on the job site at the time of claimant's accident.  None of them saw claimant fall, nor did they know what caused the accident.  Ben noted that he "heard something hit," and Webb also heard something.  Musick was in a corner nailing in studs to help build a wall when claimant fell.  However, each of them did testify that claimant was not engaged in any sort of horseplay at the time of the accident.

Claimant filed a claim for benefits on September 29, 2008 seeking to recover for his accident.  The claim requested payment of total temporary disability benefits from August 11, 2008 on, alleging that he suffered an injury by accident on that date which left him totally disabled.  The parties to the claim were David, SCHI, Liberty Mutual, CAC, Nationwide, and the

[3] In context, "they" refers to Dale Clark, David Clark, and Mark Webb.

Uninsured Employer's Fund. [4] Before the deputy commissioner, SCHI stipulated that it was the employer of the claimant for the claim, and CAC stipulated that it was the statutory employer for the claim.

In his August 20, 2009 opinion, Deputy Commissioner Burchett found that there was no compensable injury, because there was insufficient evidence to establish that claimant's injuries arose out of his employment. However, he did find that claimant was an employee of SCHI at the time of the accident. Further, he found that the commission had jurisdiction over Liberty Mutual through its policy with SCHI.

On appeal, the full commission found in its February 8, 2010 opinion that claimant's injury did arise out of his employment as a "borrowed employee." The commission stated that

> [t]he claimant testified that he did not know why he fell, but we do know from the testimony of Jim Hall that at the time the claimant fell he was "pulling plywood" and that the claimant fell through a small hole where the stairwell was to be built. This testimony is consistent with the claimant's testimony that he recalled "carrying wood" at the time of the accident. We know from Jim Hall that neither the claimant nor his co-workers were engaged in horseplay. We know from James Musick that the claimant was working right behind him when the claimant fell through this hole. We know from Mark Anthony Webb and Ben Clark that the claimant descended from a height because they heard the noise of the claimant hitting the floor. We also know from the testimony and the medical evidence that the claimant suffered severe injuries from a fall. The claimant here clearly stepped where there was no subflooring when he was pulling the plywood. It is apparent to us, upon consideration of the circumstances, that this accident arose out a [sic] risk of employment, and that there was a causal connection between the conditions under which the work was required to be performed and the resulting injuries. It is obvious that this event flowed from a risk of the claimant's employment and the only logical explanation for the fall is a connection between the work he was doing and the resulting fall.

---

[4] David Clark appeared *pro se* and presented no argument or evidence on his behalf. The Uninsured Employer's Fund was released from the claim by Deputy Commissioner Burchett.

The commission went on to say that

> [w]e have an unusual situation because of the financial entanglement between Sherry Clark Home Improvement and David Clark.  The testimony, we find, showed that Sherry and David Clark both hired the claimant to work on the Grundy job site.  Sherry Clark hired him to provide cleaning services at the job site while David Clark hired him to provide general labor.  He was therefore an employee of Sherry Clark Home Improvement and an employee of David Clark.  Carey Addison Construction issued one check to cover the cleaning and the framing work at that job site to Sherry Clark Home Improvement, but in essence he was employing David Clark to provide framing regardless of the name on the check.  We find, therefore, that David Clark was a subcontractor for Sherry Clark Home Improvement and was not an employee of Sherry Clark Home Improvement.  David Clark was also a subcontractor for Addison Construction [sic].
>
> *    *    *    *    *    *    *
>
> Here, Sherry and David hired the claimant.  Sherry paid his wages.  Apparently both could have fired the claimant.  David controlled the claimant's actions.  We find that at the time of the work accident the claimant was working for David Clark as a borrowed employee.

As a result, the commission reversed and remanded the case back to the deputy commissioner.[5]

The parties then appealed to this Court.  On May 17, 2010, we dismissed the appeal, because no final judgment had been rendered by the commission at that time.  On remand from the commission, the deputy commissioner entered an award against CAC and Nationwide as the statutory employer and insurer in a September 8, 2010 opinion.[6]  Review was sought by the full

---

[5] The commission's opinion is silent as to why it was remanded.  Although the deputy commissioner expressed his concerns over what exactly he was supposed to do on remand, he ultimately made findings on the new issue of what benefits claimant was entitled to and entered an award accordingly.

[6] CAC is liable as the statutory employer under Code § 65.2-302, which says that

> [w]hen any person (referred to in this section as "owner") undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person

- 7 -

commission, who affirmed the decision in an April 11, 2011 opinion.  Liberty Mutual, SCHI, and

CAC now appeal that decision of the commission.

## II.  Analysis

### A.  Injury "Arising Out of" the Employment

The first issue on appeal is whether the claimant's injury "arose out of" his employment.

"'The commission's decision that an accident arises out of the employment involves a mixed

question of law and fact and is thus reviewable on appeal.'"  PYA/Monarch & Reliance Ins. Co.

v. Harris, 22 Va. App. 215, 221, 468 S.E.2d 688, 689 (1996) (quoting Southside Virginia

Training Ctr./Commonwealth of Virginia v. Shell, 20 Va. App. 199, 202, 455 S.E.2d 761, 763

(1995)).

Under our workers' compensation statute, "'*[i]njury*' means only injury by accident

arising out of and in the course of the employment."  Code § 65.2-101.  "Thus, for an injury to be

compensable under the Workers' Compensation Act, the claimant must prove three elements:

(1) that the injury was caused by an accident; (2) that the injury was sustained in the course of

the employment; and (3) that the injury arose out of the employment."  Southland Corp. v.

Parson, 1 Va. App. 281, 283-84, 338 S.E.2d 162, 163 (1985).

"'The concepts "arising out of" and "in the course of" employment are not synonymous

and both conditions must be proved before compensation will be awarded.'  The claimant must

prove these elements by a preponderance of the evidence."  PYA/Monarch, 22 Va. App. at 221,

(referred to in this section as "subcontractor") for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any worker employed in the work any compensation under this title which he would have been liable to pay if the worker had been immediately employed by him.

However, the deputy commissioner noted that CAC retained a right of subrogation against David Clark to recover benefits that it pays pursuant to the commission's award.

468 S.E.2d at 691 (quoting <u>Marketing Profiles v. Hill</u>, 17 Va. App. 431, 433, 437 S.E.2d 727, 729 (1993) (*en banc*)). In this case, the only issue on appeal related to the injury itself is whether the accident "arose out of" the employment.

In an unexplained fall case, such as this, "[a]n accident arises out of the employment when there is a causal connection between the claimant's injury and the conditions under which the employer requires the work to be performed." <u>United Parcel Serv. of Am. v. Fetterman</u>, 230 Va. 257, 258, 336 S.E.2d 892, 893 (1985) (citing <u>R&T Inv. v. Johns</u>, 228 Va. 249, 252, 321 S.E.2d 287, 289 (1984)). To determine whether such a causal connection exists, Virginia applies the "actual risk test." <u>Lucas v. Lucas</u>, 212 Va. 561, 563, 186 S.E.2d 63, 64 (1972). Under this test, we require "*only* that the employment expose the workman to the particular danger from which he was injured, notwithstanding the exposure of the public to like risks." <u>Id.</u> (emphasis added). Accordingly, "the mere fact that the hazard is one to which the general public is likewise exposed . . . is not conclusive against the existence of [a] causal relationship" between the injury and the conditions under which the work was required to be performed. <u>Johns</u>, 228 Va. at 253, 321 S.E.2d at 289.

In explaining this test, courts in Virginia have repeatedly said that

> "if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But [the applicable test] excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence."

Simms v. Ruby Tuesday, Inc., 281 Va. 114, 122-23, 704 S.E.2d 359, 363 (2011) (quoting

Bradshaw v. Aronovitch, 170 Va. 329, 335, 196 S.E. 684, 686 (1938)).

In isolation, this statement might be read as suggesting that an injury is not compensable

if the injury was caused by a risk at work that would be commonly encountered by the public,

i.e., one that is "common to the neighborhood." However, the Supreme Court has explained that

such a reading presents an incomplete picture of the law in Virginia. The premise that "the

causative danger must be peculiar to the work and not common to the neighborhood" is merely a

part of the "actual risk" test, and it must be considered together with the recognition "that an

injury is compensable if it appears to have had its origin in a risk connected with the

employment, and to have flowed from that source as a rational consequence." Immer & Co. v.

Brosnahan, 207 Va. 720, 726, 152 S.E.2d 254, 258 (1967); see also Green Hand Nursery v.

Loveless, 55 Va. App. 134, 144-45, 684 S.E.2d 818, 823-24 (2009) (explaining this same

distinction). Therefore, whether the causative danger encountered by the claimant is something

the public would commonly confront is not conclusive in determining whether the danger is an

actual risk of employment. A denial of benefits based on the fact that the risk causing a

claimant's injury "is 'common to the neighborhood' presupposes the risk is not peculiar to the

claimant's work." Loveless, 55 Va. App. at 145, 684 S.E.2d at 823. However, if "there is a

causal relationship between the injury and the claimant's work responsibilities, the risk may

indeed be 'common to the neighborhood,'" insofar as it is one that the public might also

regularly encounter outside the workplace. Id. "[I]t matters not that the [risk] is common to the

neighborhood" in this sense, as long as the injury can "'fairly be traced to the employment as a

contributing proximate cause.'" Id. (quoting Johns, 228 Va. at 253, 321 S.E.2d at 290); see also

Lucas, 212 Va. at 563, 186 S.E.2d at 64.

A review of Virginia case law further illustrates this point. For instance, in the case where an employee uses a public roadway and is injured while using that roadway, our Supreme Court has held that "there must be some special risk incident to the particular employment which imposes some greater danger upon the employee than is imposed upon other persons actually using the streets." Dreyfus v. Meade, 142 Va. 567, 574, 129 S.E. 336, 338 (1925). "The test, however, is not that other persons are exposed to similar risks, but rather that the employment exposes the workman to the particular danger in the street." Id. The crux of this test is apparent when you compare how it has been previously applied. For example, the Supreme Court held that an injury sustained by an employee on a public roadway was compensable by virtue of the fact that the employer ordered the employee to see a doctor for treatment of a work-related injury and to use the roadway to that end. Brosnahan, 207 Va. at 727-28, 152 S.E.2d at 259. On the other hand, the Supreme Court held that an injury sustained by an employee during his lunch hour on a public roadway that the employee used voluntarily and not due to any condition of his employment was not compensable. Dreyfus, 142 Va. at 575-76, 129 S.E. at 338-39. The reason for the different outcomes in these cases is readily apparent. In the first instance, the employee's injury was caused by a danger he encountered as a condition of his work, while in the second instance the injury, although caused by the same danger, had no relation to a condition of his work. This distinction has been reaffirmed in more modern cases. Compare Johns, 228 Va. at 251-52, 254-55, 321 S.E.2d at 288, 290 (holding that an employee's injuries arose out of his employment when he had a violent encounter with bank robbers when he was carrying large sums of money and delivering that money to a bank as part of his job), with Baggett Transp. Co. v. Dillon, 219 Va. 633, 635-36, 644, 248 S.E.2d 819, 821, 826 (1978) (holding that a truck driver's injuries did not arise out of employment when he was shot in a random shooting after he stopped on the side of a highway). Thus, where a claimant encounters a causative danger that

the public might also be exposed to and is injured as a result, the claimant can recover so long as he encountered the danger as a part of his work responsibilities.

This conclusion leads us to a corollary particularly relevant to the case at bar: where a claimant has sufficiently proved the existence of a causal relationship between the injury and a hazard in the workplace that is "'uniquely dangerous' and not something that would 'routinely be encountered by anyone,'" the injury necessarily arises out of the employment. Turf Care v. Henson, 51 Va. App. 318, 326, 657 S.E.2d 787, 791 (2008) (quoting Beland, 43 Va. App. at 361, 597 S.E.2d at 290). Accordingly, we have upheld awards in favor of claimants that injured themselves by falling from high places—places that those claimants' employment required them to be. See id. at 323, 327, 657 S.E.2d at 789, 791 (upholding an award to claimant for an injury caused by a fall from a forty-foot ladder); Beland, 43 Va. App. at 354-55, 361, 597 S.E.2d at 287, 290 (similarly upholding an award to claimant for an injury caused by a fall from an eight-foot ladder); see also City of Waynesboro v. Griffin, 51 Va. App. 308, 311, 317, 657 S.E.2d 782, 783, 786 (2008) (upholding an award to claimant for an injury caused by a six and a half-foot fall from a front-end loader loaded onto a flatbed trailer).

If, however, a claimant cannot establish a causal relationship between a purported work hazard and his injury, the claimant cannot recover under the Workers' Compensation Act. See PYA/Monarch, 22 Va. App. at 219-21, 468 S.E.2d at 690-91 (holding that a claimant's injury was a non-compensable unexplained accident when he found himself lying outside of his delivery truck, injured, with no memory of what happened). Characterizing Herndon's accident as an "unexplained fall," CAC argues that Herndon could have fallen down a hole on the second story of a house under construction for any number of reasons. Accordingly, CAC argues that our holding in PYA/Monarch requires us to reverse the commission.

The problem with this argument is that it misconstrues the focus of our inquiry. The key focus is not the relationship between the injury and its cause but rather the relationship between the injury and the employment. In PYA/Monarch, the claimant found himself lying on the ground outside of his truck with a head injury in icy conditions. Id. at 219, 468 S.E.2d at 690. The claimant could not remember how he got to that location; instead, the last thing he could remember was beginning the process of exiting the truck cab. Id. There were no other witnesses to establish what had happened to the claimant. See id. at 219-20, 468 S.E.2d at 690. Nevertheless, the claimant alleged that a design defect in the truck or the icy conditions caused him to fall seven feet from the truck cab to the ground. Id. However, no credible evidence established that the claimant had actually fallen out of or from the truck cab; at best the evidence only established that he had "fallen" in the sense that he found himself inexplicably lying on the ground. Id. at 224-25, 468 S.E.2d at 692. The evidence was insufficient for the fact finder to infer that the claimant's *injury* "arose out of the employment," because it was mere speculation that the claimant fell while exiting the cab of his truck due to a design defect in the truck or the weather conditions. Id. at 224-25, 468 S.E.2d at 692-93.

The facts in PYA/Monarch are distinguishable from this case, where there is ample evidence in the record supporting the commission's holding that claimant's injuries "arose out of" his employment. The commission based its decision on its conclusion that "at the time the claimant fell he was 'pulling plywood' and that the claimant fell through a small hole where the stairwell was to be built." We are bound by the factual findings of the commission if they are supported by credible evidence. Beland, 43 Va. App. at 358, 597 S.E.2d at 289. "'[T]he commission, like any other fact finder, may consider both direct and circumstantial evidence in its disposition of a claim. Thus, the commission may properly consider all factual evidence, from whatever source, whether or not a condition of the workplace caused the injury.'" Griffin,

51 Va. App. at 313, 657 S.E.2d at 784 (quoting VFP, Inc. v. Shepherd, 39 Va. App. 289, 293, 572 S.E.2d 510, 512 (2002)).

In this case, claimant testified, "I was carrying wood. I remember there was, in the second – the second story, there was a hole off the stairwell as far as carrying the wood up. And that's what – what they said I fell through, but I don't remember the fall." He later added that the "only thing [he] can actually remember is carrying wood up to the guys making the walls." Since the last thing the claimant remembers before the accident was that he was "carrying wood," the commission could have reasonably inferred that whether claimant continued to "pull plywood" from the time Jim Hall observed him until the point of his accident, hours later, or was simply "carrying" some unspecified type and amount of wood, the accident nevertheless arose out of claimant's employment.[7] Further, unlike the claimant in PYA/Monarch, it is clear that claimant actually fell. Claimant was found in the basement directly under the holes in the first and second floors. His severe injuries suggest a fall from a great height. Although none of his

---

[7] We reject CAC's contention that the commission's finding that claimant was "pulling plywood" at the time of the accident is without evidence to support it. CAC argues that, while the injury took place in the early afternoon, the only direct evidence in the record that claimant was "pulling plywood" is from the testimony of Hall who testified that he observed claimant "pulling plywood," but that it was "kind of early in the morning actually." However, the commission also reasoned that their finding was "consistent with the claimant's testimony that he recalled 'carrying wood' at the time of the accident."

> [T]he mere nonexistence of direct evidence in the form of the claimant's memory or an eyewitness' account does not, in and of itself, preclude an award of benefits. On the contrary, the commission may find an explanation for an accident based on circumstantial evidence, when that evidence "allow[s] an inference that the claimant suffered an injury by accident arising out of . . . his employment." There is sufficient "circumstantial evidence to support such an inference when "the circumstantial evidence . . . takes the question beyond surmise or conjecture. . . ."

Griffin, 51 Va. App. at 314-15, 657 S.E.2d at 785 (quoting Marketing Profiles, 17 Va. App. at 433, 437 S.E.2d at 729; VFP, Inc., 39 Va. App. at 293, 572 S.E.2d at 512).

- 14 -

co-workers saw claimant fall, several noted that they "heard something hit." Thus, because claimant's fall from height was a result of the work environment and the fall from height caused his injuries, he has established the "causal connection between the . . . injury and the conditions under which the employer require[d] the work to be performed." Fetterman, 230 Va. at 258, 336 S.E.2d at 893.

This conclusion is strengthened when we compare Herndon's injury with an injury resulting from an unexplained fall in a normal environment, e.g., a slip and fall on a level, ordinary floor with no defective characteristics, is not compensable. Mem'l Hosp. of Martinsville and Henry Cnty. v. Hairston, 2 Va. App. 677, 679, 681-82, 347 S.E.2d 527, 527-28, 529 (1986). In Hairston the record indicated that the claimant "was walking on a flat, level surface in a well-lighted area" when she suddenly fell. Id. at 682, 347 S.E.2d at 528. "The circumstances did not show that the fall resulted from any condition peculiar to the work environment, or any physical condition afflicting [the claimant]. Rather, she inexplicably wound up on the floor, injured but conscious." Id. On these facts, this Court reversed an award of compensation by the commission, since the claimant failed to show that an actual risk of the employment caused her injury, i.e., that a condition in the floor posing some risk of injury actually caused her injury. Id. Therefore, we hold that there is sufficient evidence in the record to support the conclusion of the commission that the injury arose out of the claimant's employment as required by the Workers' Compensation Act.

### B. Borrowed Employee Doctrine

The second issue on appeal is whether the commission erred in finding that claimant was acting as a borrowed employee at the time of the accident.[8] In Ideal Steam Laundry v. Williams,

---

[8] CAC and Nationwide assign error to the commission's findings that Herndon was not an employee of SCHI and that, at the time of Herndon's work accident, he was working for

- 15 -

153 Va. 176, 149 S.E. 479 (1929), our Supreme Court recognized that, at common law, an

employee may be borrowed by one employer from another. The Court held that our workers'

compensation statute did not change the common law, and extended this legal theory to workers'

compensation claims. The Court noted that

> [a] servant may be transferred from his service for one master --
> who may have made the express contract of employment of the
> servant and may pay the latter his wages, and be his general master
> -- to the service of another person other than his general master; in
> which case -- (1) The special master is alone liable to third persons
> for injuries caused by such acts as the special servant may commit
> in the course of his employment; (2) the special servant must look
> to the special master for his indemnity, if he is injured, while the
> stipulated work is in progress, by dangerous conditions resulting
> from the special master's failure to fulfil [sic] one of those duties
> which the law imposes upon the masters for the benefit and
> protection of their servants.

Id. at 180-81, 149 S.E. at 481.

> Under the borrowed servant doctrine, a worker, although directly
> employed by one entity, may be transferred to the service of
> another so that he becomes the employee of the second entity
> "with all the legal consequences of the new relation." One of the
> legal consequences of the "new relation" is that workers'
> compensation is the injured employee's exclusive remedy against
> the second entity-employer.

Metro Machine Corp. v. Mizenko, 244 Va. 78, 82, 419 S.E.2d 632, 634 (1992) (quoting Standard

Oil v. Anderson, 212 U.S. 215, 220 (1909)).

In Metro Machine, the Court discussed the factors in determining if a borrowed employee

relationship exists.

> [C]ontrol over the employee is the most important factor in
> consideration of the borrowed servant status, although it alone may
> not be dispositive. Factors generally accepted as appropriate
> considerations in this area were delineated in [Ruiz v. Shell Oil
> Co., 413 F.2d 310, 312-13 (5th Cir. 1969)], and [Gaudet v. Exxon

David Clark as a borrowed employee. However, the arguments are interrelated, and thus, we
address them together.

Corp., 562 F.2d 351, 355, 357 (5th Cir. 1977), cert. denied, 436 U.S. 913 (1978)]. These include: (1) who has control over the employee and the work he is performing; (2) whether the work performed is that of the borrowing employer; (3) was there an agreement between the original employer and the borrowing employer; (4) did the employee acquiesce in the new work situation; (5) did the original employer terminate its relationship with the employee; (6) who is responsible for furnishing the work place, work tools and working conditions; (7) the length of the employment and whether it implied acquiescence by the employee; (8) who had the right to discharge the employee; and (9) who was required to pay the employee.

Id. at 83, 419 S.E.2d at 635 (internal citations omitted).

Control is important in determining the special employer relationship because it imposes liability upon the employer who was most directly responsible for the employee's actions at the time of the injury. The theory is that as between two employers, the one who controls the employee's actions and whose work the employee is performing should be responsible for providing compensation for the employee's injuries.

Virginia Polytechnic & State Univ. v. Frye, 6 Va. App. 589, 593, 371 S.E.2d 34, 36 (1988).

In this case, the commission found that both "Sherry and David hired the claimant. Sherry paid his wages. Apparently both could have fired the claimant. David controlled the claimant's actions." Upon these facts, the commission found that claimant was working for David Clark as a borrowed employee. While the commission did not discuss all of the factors in reaching its ultimate finding, it discussed the most important detail: control. The failure to address each factor enumerated above does not render the commission's finding improper. Instead, the commission clearly "impose[d] liability upon the employer who was most directly responsible for the employee's actions at the time of the injury." Id.

- 17 -

Finally, we decline to address Liberty Mutual and SCHI's assignments of error relating to this case. [9]  Because Liberty Mutual and SCHI were not aggrieved by the commission's judgment, their assignments of error are moot.  "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Powell v. McCormack, 395 U.S. 486, 496 (1969).  "'The general rule [is] that appellate courts do not sit to give opinions on moot questions or abstract matters, but only to decide actual controversies injuriously affecting the rights of some party to the litigation.'"  Baldwin v. Commonwealth, 43 Va. App. 415, 421, 598 S.E.2d 754, 757 (2004) (quoting Hallmark v. Jones, 207 Va. 968, 971, 154 S.E.2d 5, 7 (1967)).  Thus, any action by this Court would constitute issuing an improper advisory opinion.  "As a general rule, 'moot questions are not justiciable and courts do not rule on such questions to avoid issuing advisory opinions.'"  In re Times-World Corp., 7 Va. App. 317, 323, 373 S.E.2d 474, 476 (1988) (quoting United States v. Peters, 754 F.2d 753, 757 (7th Cir. 1985)).

## IV.  Conclusion

Because credible evidence exists to support the factual findings of the commission that claimant's injuries "arose out of" his employment, this Court finds that the commission did not err in finding that the claimant had a compensable claim.  Also, because sufficient evidence exists to support the commission's finding that claimant was acting as a borrowed employee for

---

[9] Liberty Mutual and SCHI conceded at oral argument that the judgment of the commission does not currently impact them, but they noted their appeal because a potential reversal and remand by this Court to the commission on either of the assignments of error identified by CAC and Nationwide could affect their interests at that time.  Liberty Mutual and SCHI also conceded that they are seeking what amounts to an advisory opinion from this Court concerning judgments and factual findings not yet made by the commission and, thus, are not ripe for appellate review.

David Clark at the time of the accident, we find that the commission did not err in finding Carey

Addison Construction liable as the statutory employer.

<u>Affirmed </u>as to Record No. 0943-11-3.
<u>Dismissed </u>as to Record No. 0936-11-3.
<u>Dismissed </u>as to Record No. 0957-11-3.